**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANDREA COCHRAN | No. 2:25-cr-00120-LEW |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States submits this memorandum to assist the Court in determining an appropriate sentence in the above-captioned matter.

In this memorandum, the government addresses the remaining objections to the Revised Presentence Investigation Report ("PSR") dated November 13, 2025, as identified in the Addendum to the PSR ("PSR Addendum"). This memorandum addresses:

1. Whether Counts One and Two are properly grouped pursuant to U.S.S.G. § 3D1.2 where Count Two is not treated as a specific offense characteristic for Count One under U.S.S.G. § 2B1.1(b)(11).

2. Whether Cochran is entitled to a minor-participant adjustment pursuant to U.S.S.G. § 3B1.2(b).

The government will address its view of the 18 U.S.C. § 3553 sentencing factors at the time of sentencing.

**Relevant Background**

On June 20, 2024, Cochran entered a branch of Credit Union 1 ("CU-1") in Westbrook, Maine and withdrew money from accounts that Victim A-1 maintained at CU-1, a financial institution whose deposits were insured by the National Credit Union

Share Insurance Fund through the National Credit Union Administration. Dkt. S-3557751 at 1.

In the Westbrook CU-1 branch, Cochran presented an instrument purporting to be a United States passport card—bearing an image of Cochran and the name and date of birth of Victim A-1—and Victim A-1's social security number as means and forms of identification to identify herself as Victim A-1. *Id.* Cochran then withdrew $5,200 and $6,800 from two accounts maintained by Victim A-1 at CU-1. Cochran electronically signed for each transaction—forging a signature that purported to be the signature of Victim A-1—and left the Westbrook CU-1 branch with $12,000 in cash. *Id.*

On that same date, Cochran entered the Portland CU-1 branch and withdrew additional money from Victim A-1's accounts by identifying herself as Victim A-1. *Id.* Cochran was not authorized to access Victim A-1's accounts. *Id.* at 2.

On that same date, Cochran was arrested in or near the Windham CU-1 branch by the Windham Police Department. At the time of her arrest, Cochran possessed a credit or debit card bearing Victim A-1's name and an instrument purporting to be a United States passport card bearing an image of Cochran and Victim A-1's name and date of birth. At the Westbrook Public Safety office, Cochran admitted that she obtained money at two banks using the purported passport card, though she recalled obtaining different amounts at the second branch than CU-1 later reported to the United States Diplomatic Security Service ("DSS"). *Id.* at 2.

Cochran willfully and knowingly used a false, forged, and counterfeited instrument purporting to be a passport. *Id.* at 2. Specifically, she presented the instrument purporting to be a United States passport card as a form of identification to CU-1 and withdrew money from Victim A-1's accounts. *Id.* at 2. DSS queried the

2

Department of State's passport records and determined that no passport card bearing the number on the card Cochran possessed and used had ever been issued bearing Victim A-1's name and date of birth. *Id.* at 2-3.

Cochran knowingly possessed and used, without lawful authority, a means of identification of Victim A-1 during and in relation to felony bank fraud in violation of 18 U.S.C. § 1344, knowing that the means of identification belonged to another actual person. *Id.* at 3. Specifically, Cochran possessed and presented Victim A-1's name, date of birth, and social security number and forged Victim A-1's signature to withdraw money from Victim A-1's accounts. *Id.* at 3.

Before coming to Maine, Cochran had engaged in similar conduct at multiple financial institutions in other states, including Washington and New Jersey. *See e.g.* PSR at ¶ 5. The government has not alleged—nor could it demonstrate with admissible evidence—that Cochran personally created, or caused to be created, the fraudulent instruments purporting to be United States passport cards bearing victims' PII that she possessed and used to commit the offenses in Maine and other districts.

As to her conduct in Maine, Cochran was charged by information with bank fraud in violation of 18 U.S.C. § 1344 (Count One), false use of a passport in violation of 18 U.S.C. § 1543 (Count Two), and aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 1028A(b) (Count Three). Dkt. 34. Cochran pleaded guilty to all three counts on August 28, 2025, pursuant to a plea agreement. PSR at ¶ 2.

## Argument

**I. COUNTS ONE AND TWO ARE NOT PROPERLY GROUPED PURSUANT TO U.S.S.G. § 3D1.2 BECAUSE COUNT TWO IS NOT TREATED AS A SPECIFIC OFFENSE CHARACTERISTIC UNDER U.S.S.G. § 2B1.1(b)(11) FOR COUNT ONE.**

When a defendant has been convicted of multiple counts, the Sentencing Guidelines direct the sentencing court to: first, "[g]roup the counts resulting in conviction into distinct Groups of Closely Related Counts ('Groups') by applying the rules specified in § 3D1.2[;]" second, "[d]etermine the offense level applicable to each Group by applying the rules specified in § 3D1.3[;]" and, third, "[d]etermine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4." U.S.S.G. § 3D1.1(a)(1)-(3). Any count of conviction under 18 U.S.C. § 1028A is explicitly excluded from the application of U.S.S.G. §§ 3D1.2 through 3D1.5. U.S.S.G. § 3D1.1(b)(2). In Cochran's case, therefore, the conviction for aggravated identity theft in violation of 18 U.S.C. § 1028A, as charged in Count Three, is excluded from the grouping provisions of U.S.S.G. §§ 3D1.2 through 3D1.5.

According to the Sentencing Guidelines:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> (a) When counts involve the same victim and the same act or transaction.
>
> (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
>
> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior . . . .

U.S.S.G. § 3D1.2.

4

It is uncontested that U.S.S.G. §§ 3D1.2(a) and 3D1.2(b) do not call for grouping Counts One and Two together in this case, as Victim A-1 and CU-1 were the victims of Count One and the United States and the societal interest harmed by passport fraud offenses were the victims of Count 2. *See* U.S.S.G. § 3D1.2, comment. (n.2) ("For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed.").

The guideline applicable to Count One is U.S.S.G. § 2B1.1, and the guideline applicable to Count Two is U.S.S.G. § 2L2.2. Offenses covered by U.S.S.G. § 2L2.2 are specifically excluded from the operation of U.S.S.G. § 3D1.2(d). Counts One and Two are therefore not properly grouped pursuant to that subsection. *See* U.S.S.G. § 3D1.2(d).

Thus, the issue before the Court is whether Count Two "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" Count One, such that Counts One and Two would be properly grouped pursuant to U.S.S.G. § 3D1.2(c). Probation suggests that Count Two embodies conduct that is a specific offense characteristic—specifically, U.S.S.G. § 2B1.1(b)(11)—in U.S.S.G. § 2B1.1, the guideline applicable to Count One. The government respectfully disagrees.

Contrary to Probation's view, the government does not suggest that the PII on the fraudulent instrument purporting to be United States passport card that Cochran used to commit the offenses charged in Counts One and Two are not means of identification. *See* PSR Addendum at 35-36. Rather, the government observes that Count Two simply does not embody conduct that is treated as a specific offense characteristic under U.S.S.G. § 2B1.1(b)(11).

As relevant to Count Two, 18 U.S.C. § 1543 establishes criminal penalties for "[w]however willfully and knowingly uses, or attempts to use, or furnishes to another for use any such false, forged, counterfeited, mutilated, or altered passport or instrument purporting to be a passport . . . ." In contrast, U.S.S.G. § 2B1.1 provides for a two-level adjustment (with a minimum resulting offense level of twelve (12)):

> If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification . . . .

U.S.S.G. § 2B1.1(b)(11).

Cochran used a false, forged, and counterfeited instrument purporting to be a United States passport card—bearing her image and the name and date of birth of Victim A-1—and Victim A-1's social security number as forms of identification to impersonate Victim A-1 and withdraw money from Victim A-1's accounts. *See* Dkt. S-3557751 at 2. However, the government does not allege—and Probation does not suggest—that Cochran possessed or used any device-making equipment or authentication feature, or that Cochran produced or trafficked in any unauthorized access device, counterfeit access device, or authentication feature. *See* U.S.S.G. §§ 2B1.1(b)(11)(A)(i)-(ii), 2B1.1(b)(11)(B)(i)-(ii). Nor does the government allege—or Probation suggest—that Cochran's bank fraud offense in Count One involved "the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification. . . ." *See* U.S.S.G. § 2B1.1(b)(11)(C)(ii). Probation suggests only that "[t]he means of identification (passport

6

card number, name, and/or date of birth) were obtained in what appears to be an unlawful manner. They were then used to unlawfully create a fraudulent passport card containing three distinct means of identification with the defendant's photograph which was then used to steal money from the victim's financial account." PSR Addendum at 36.

The government agrees that the means of identification were almost certainly obtained in an unlawful manner, given that Victim A-1 did not authorize Cochran to possess and use Victim A-1's means of identification. *See* Dkt. S-3557751 at 3. Regardless, the PSR does not demonstrate that Cochran used the false, forged, and counterfeited instrument purporting to be a United States passport card "unlawfully to produce or obtain any other means of identification," U.S.S.G. § 2B1.1(b)(11)(C)(i). The government does not allege, nor could it establish by admissible evidence, that Cochran created the false instrument purporting to be a United States passport card. She used that instrument to obtain money from Victim A-1's accounts. Thus, Cochran neither used those means of identification to produce any other means of identification nor to obtain such means of identification.

Because Count Two does not "embod[y] conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" Count One such that Counts One and Two are properly grouped pursuant to U.S.S.G. § 3D1.2(c), and U.S.S.G. § 3D1.2(a), (b), and (d) are inapplicable, Counts One and Two constitute separate groups.

The government respectfully submits that the applicable, advisory guidelines range should be calculated as follows:

| Count 2 (§ 1543) | | Count 1 (§ 1344) | Count 3 (§ 1028A) |
|---|---|---|---|
| § 2L2.2 | | § 2B1.1 | § 2B1.6 |
| BOL: 8<br>  +4  ((b)(3)(A))<br>  12 | | BOL: 7<br>  +6  ((b)(1)(D))<br>  +2  ((b)(2)(A)(i))<br>  15 | 24 months mandatory minimum |
| Group 1: OL 12 | | Group 2: OL 15 | |
| § 3D1.4    +1 Unit<br><br>     OL 15<br>      +2  (2 Units)<br>     17<br><br>      -3  (§ 3E1.1)<br>     14 | +1 Unit | | |

With a total offense level of fourteen (14) and a criminal history category of III, Cochran's advisory guidelines sentence on Counts One and Two is 21 to 27 months of imprisonment, a fine of $7,500 to $75,000, or both.

Because the twenty-four-month sentence for Count Three must run consecutively to any other term of imprisonment imposed, *see* 18 U.S.C. §§ 1028A(a)(1), 1028A(b)(2), the aggregate advisory guidelines sentence of imprisonment for Counts One, Two, and Three is 45 to 51 months.

Probation has recommended that Cochran receive a two-level reduction as a minor participant pursuant to U.S.S.G. § 3B1.2(b). PSR at ¶¶ 9, 23. The government opposes that adjustment as addressed below. Should the Court conclude that Cochran is entitled to a minor-participant adjustment, the government respectfully submits that the applicable, advisory guidelines range should be calculated as follows:

| Count 2 (§ 1543) | Count 1 (§ 1344) | Count 3 (§ 1028A) |
|---|---|---|
| § 2L2.2 | § 2B1.1 | § 2B1.6 |
| BOL: 8<br>   +4  ((b)(3)(A))<br>   <u>-2</u>  (§ 3B1.2(b))<br>   10 | BOL: 7<br>   +6  ((b)(1)(D))<br>   +2  ((b)(2)(A)(i))<br>   <u>-2</u>  (§ 3B1.2(b))<br>   13 | 24 months mandatory minimum |
| Group 1: OL 10 | Group 2: OL 13 | |
| § 3D1.4   +1 Unit        +1 Unit<br><br>       OL 13<br>          <u>+2</u>  (2 Units)<br>          15<br><br>           <u>-2</u> (§ 3E1.1)<br>           13 | | |

With a total offense level of thirteen (13) and a criminal history category of III, Cochran's advisory guidelines sentence on Counts One and Two would be 18 to 24 months of imprisonment, a fine of $5,500 to $55,000, or both.

Because the twenty-four-month sentence for Count Three must run consecutively to any other term of imprisonment imposed, *see* 18 U.S.C. §§ 1028A(a)(1), 1028A(b)(2), the aggregate advisory guidelines sentence of imprisonment for Counts One, Two, and Three would be 42 to 48 months.

## II. COCHRAN HAS NOT YET DEMONSTRATED THAT SHE IS ENTITLED TO A MINOR-PARTICIPANT ADJUSTMENT UNDER U.S.S.G. § 3B1.2.

A sentencing court is permitted to decrease a defendant's offense level by two levels "if he 'was a minor participant in any criminal activity' for which he is being held accountable." *United States v. Arias-Mercedes*, 901 F.3d 1, 5 (1st Cir. 2018) (*citing* U.S.S.G. § 3B1.2(b)). A minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."

U.S.S.G. § 3B1.2, comment. (n.5). "A defendant 'bears the burden of proving, by a preponderance of the evidence, that he is entitled to a mitigating role adjustment.'" *United States v. Guia-Sendeme,* 134 F.4th 611, 617 (1st Cir. 2025) (cleaned up) (*quoting Arias-Mercedes,* 901 F.3d at 5).

The First Circuit has established a four-part analysis to determine whether a defendant has met their burden. *Guia-Sendeme*, 134 F.4th at 617. First, the sentencing court "must identify the universe of participants involved in the relevant criminal activity." *Id.* (*citing Arias-Mercedes,* 901 F.3d at 6). Second, the court "must order each participant along a continuum based on the degree of culpability in the criminal activity," with the ends of that continuum represented by the person(s) "who are primarily responsible" and "the least culpable participants," respectively. *Id.* (*citing United States v. Walker,* 89 F.4th 173, 185 (1st Cir. 2023)). Third, the court "must identify the average participant across all likely participants in the criminal scheme." *Id.* (*citing Walker,* 89 F.4th at 185). Fourth, the court must engage in a two-part inquiry to "compare the defendant's role in the criminal activity to the average participant's role." *Id.* (*citing Walker,* 89 F.4th at 185-86).

### a. The universe of participants involved in the criminal activity

For present purposes, a "participant" is a person who is criminally responsible for the commission of the offense (but need not have been convicted of the offense), where there is "sufficient evidence of the person's existence and involvement in the crime." *Guia-Sendeme,* 134 F.4th at 617 (*citing Arias-Mercedes,* 901 F.3d at 6). The universe of participants looks to all relevant conduct within the scope of U.S.S.G. § 1B1.3, rather than just "the basis of elements and acts cited in the count of conviction." *Id.* at 619 (*citing* U.S.S.G. Ch.3, Pt.B, intro. comment.).

Here, in addition to the charged offenses she committed in Maine, Cochran will be held responsible for a total loss amount that includes similar bank-fraud offenses she committed in other states, including Washington and New Jersey. *See* PSR at ¶¶ 5, 19. Thus, the universe of participants includes those who are also responsible for the commission of her offenses in Maine and in other districts. There were at least two others engaged in these criminal offenses with Cochran. *See* PSR at ¶ 7.

### b. The continuum of culpability

The government has limited, admissible evidence with which it could establish the respective roles of those involved Cochran's criminal offenses. Arguably, the most culpable participants were those who obtained victims' PII, produced the fraudulent instruments purporting to be United States passport cards, provided those cards to Cochran, directed Cochran's travel and conduct within the financial institutions, and retained most of the proceeds of the scheme. The government possesses insufficient, admissible evidence to confirm whether the two individuals known to have engaged in these offenses with Cochran played all or most of these roles themselves.

Regardless, the government does not allege that Cochran herself obtained victims' PII, ordered or produced the fraudulent instruments, directed where she and others would travel, or retained most of the proceeds of the scheme. The government assumes, in the specific circumstances of this case, that Cochran is on the less-culpable end of the continuum.

### c. The average participant

The sentencing court is not required to "identify a single average participant among the universe of discernable participants involved in the relevant conduct" or to "engage in a precise, numerical calculation." *Guia-Sendeme,* 134 F.4th at 617 (cleaned

11

up) (*citing United States v. Chichande,* 113 F.4th 913, 916 (9th Cir. 2024)).

Given the limited, admissible information in the government's possession regarding the others involved in Cochran's conduct, it is difficult to definitively identify the average participant's role. From evidence in the record, including the PSR, the Court can reasonably infer that, at minimum, one or more persons obtained the victims' PII, produced the false instruments purporting to be United States passport cards, provided those cards to Cochran, directed Cochran's travel and conduct within the financial institutions, and retained most of the proceeds of the scheme. The government assumes, for present purposes, that the average participant would be the person(s) who obtained the false instruments, provided them to Cochran, and directed Cochran's travel and conduct within the financial institutions.

### d. The defendant's role compared to that of the average participant

At the first step, the sentencing court's two-part inquiry in comparing the defendant's role to the average participant's role requires the defendant to "demonstrate that they are 'substantially less culpable than the average participant in the criminal activity.'" *Guia-Sendeme,* 134 F.4th at 617 (*quoting Walker,* 89 F.4th at 185). Then, where the defendant seeks a minor-participant reduction, the defendant must demonstrate that they are "'<u>less culpable than most </u>other participants in the criminal activity . . . .'" *Id.* (emphasis in original) (*quoting Walker,* 89 F.4th at 185).

In comparing the defendant's role to the average participant's role, the sentencing court should consider a non-exhaustive list of factors including:

> (i) The degree to which the defendant understood the scope and structure of the criminal activity;
> (ii) The degree to which the defendant participated in planning or organizing the criminal activity;

(iii) The degree to which the defendant exercised decision-making authority or influenced the decision-making authority;

(iv) The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) The degree to which the defendant stood to benefit from the criminal activity.

*Guia-Sendeme,* 134 F.4th at 618 (*citing* U.S.S.G. § 3B1.2, comment. (n.3(C)); *Walker,* 89 F.4th at 187). This analysis is fact-specific and looks to the totality of the circumstances. *Id.* at 618. Moreover, "whether a defendant played 'an essential or indispensable role in the criminal activity is not determinative' of eligibility." *Id.* (*quoting* U.S.S.G. § 3B1.2, comment. (n.3(C))).

The government possesses limited, admissible, direct evidence regarding Cochran's role, if any, in planning or organizing the conduct she carried out in furtherance of the scheme or the degree of decision-making authority or influence she possessed or exerted. The government assumes that these factors weigh in Cochran's favor.

However, having committed multiple bank-fraud offenses from Washington to Maine between May 7, 2024, and June 20, 2024, it would defy belief to suggest that Cochran did not understand the scope and structure of the scheme. *See* PSR at ¶ 5. While she clearly played an essential and indispensable role—by entering financial institutions, impersonating victims, presenting false instruments purporting to be United States passport cards with her photograph but victims' PII, and obtaining money from victims' accounts—it is her understanding of the scope and structure of the scheme, as well as the nature and extent of her participation in that scheme, that most weigh against a minor-participant adjustment. The geographical scope, frequency, and

breadth of her conduct demonstrate that she understood the scope and structure of the scheme and her own responsibilities therein, that at each financial institution in each state she made the decision to continue to carry out the scheme, and that she did so for her own anticipated financial gain.

At this time, on balance, Cochran has not demonstrated that she is less culpable than most other participants in the criminal activity for which she will be held responsible. The government will further address its view of these factors and its position on the minor-participant adjustment—considering any evidence and argument adduced by Cochran—at the time of sentencing.

## Conclusion

The government will address its view of the 18 U.S.C. § 3553 sentencing factors at the time of sentencing.

Dated: June 29, 2026                    Respectfully submitted,

                                        ANDREW B. BENSON
                                        United States Attorney

                        BY:    */s/ Nicholas Heimbach*
                                Assistant United States Attorney
                                United States Attorney's Office
                                100 Middle Street
                                East Tower, 6th Floor
                                Portland, Maine 04101
                                (207) 780-3257
                                Nicholas.heimbach@usdoj.gov

14

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2026, I electronically filed the Government's Sentencing Memorandum with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Matthew Crockett, Esq.
Counsel for Defendant

ANDREW B. BENSON
United States Attorney

BY:    */s/ Nicholas Heimbach*
Assistant United States Attorney
United States Attorney's Office
100 Middle Street
East Tower, 6th Floor
Portland, Maine 04101
(207) 780-3257
Nicholas.heimbach@usdoj.gov

15